IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs February 23, 2017 at Knoxville

**JAMES L. DOWELL III v. STATE OF TENNESSEE**

**Appeal from the Criminal Court for Davidson County
No. 2010-B-1177     Cheryl A. Blackburn, Judge**

_____

**No. M2016-01364-CCA-R3-PC**
_____

The Petitioner, James L. Dowell III, appeals from the denial of his petition for post-conviction relief, wherein he challenged his jury conviction for first-degree felony murder. In this direct appeal as of right, the Petitioner raises the following ineffective assistance of counsel claims: (1) whether trial counsel failed to adequately meet with the Petitioner and effectively communicate regarding the details of his case and defense strategy; (2) whether trial counsel failed to call a witness to establish a duress defense, thus, leading to no defense being presented at all; and (3) whether trial counsel failed to convey a plea offer made by the State. After a thorough review of the record, we affirm the judgment of the post-conviction court.

 **Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**


D. KELLY THOMAS, JR., J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and ROBERT H. MONTGOMERY, JR., JJ., joined.

Nathan D. Cate, Nashville, Tennessee, for the Appellant, James L. Dowell III.

Herbert H. Slatery III, Attorney General and Reporter; Brent C. Cherry, Senior Counsel; Glenn R. Funk, District Attorney General; and Megan M. King, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**
FACTUAL BACKGROUND

     This case arises from a December 10, 2008 robbery at Ace Market in Davidson County, Tennessee, during which one of the employees, Lindergh Thompson ("the

victim"), was shot three times, resulting in his death. For his participation in the robbery, the Petitioner, along with Rivera L. Peoples and Brian I. Moreland, was indicted on charges of first degree felony murder, attempted second degree murder (involving another victim, Antionette Bell, who was also shot during the robbery), and employing a firearm during a dangerous felony. The Petitioner was tried separately from his co-defendants.[1]

The State dismissed the attempted second degree murder and firearm charges, and the Petitioner proceeded to a jury trial on the first degree felony murder charge. See Tenn. Code Ann. § 39-13-202 (felony murder). His first trial resulted in a hung jury, but at his second trial in July 2012, he was found guilty as charged of first degree felony murder. Thereafter, the trial court sentenced him to a life sentence in the Tennessee Department of Correction.

A. Trial. Gift Bondwe, a cashier at Ace Market, recalled that, on December 10, 2008, the victim was killed while taking out the trash. During a later autopsy, it was determined that the victim was shot three times.

The parties presented the following evidence at the Petitioner's second trial:

Bondwe described the events leading up to the shooting, saying that Bondwe was at the cash register organizing the money received from sales that evening. [The victim] went to take the trash to the dumpster, and Bondwe heard a "boom boom." . . . Bondwe recalled that a customer who had previously left the market came running back into the market, saying "[T]hese people are crazy . . . they're shooting outside." Bondwe said he walked to one of the store coolers while calling 911 to report the shooting.

. . . .

Bondwe said that, when police arrived, he recounted the events for them, including that a customer had returned to the store after hearing the gunfire outside. When he returned to the inside of the store, he saw the customer, Antionette Bell, crawling from a second cooler in the store away from a pool of blood. At that point, he realized that she had also been shot.

Bondwe testified that the store had some video surveillance of the shooting and that he gave the video footage to police officers. The video of

---

[1]    Rivera L. Peoples was also tried and convicted by a jury of first degree felony murder for his participation in these events. See State v. Rivera L. Peoples, No. M2010-02162-CCA-R3-CD, 2012 WL 2356584, at *7 (Tenn. Crim. App. June 20, 2012).

the shooting was then played for the jury. The video showed the [Petitioner's] entering the store. Bondwe recalled that, when the [Petitioner] entered the store, he spoke to Bondwe, saying, "[W]hat's up, Chicken George," which was a statement both men recognized as a greeting. The [Petitioner], who was on the phone, walked to the back and asked Bondwe several times the price on different items, which Bondwe found unusual. [The victim] opened the door "a little bit," and, in doing so, [the victim] was ensuring that everyone was out of the store before [the victim] took the trash to the dumpster. Bondwe said that [the victim] was "very cautious" about security. The video depicted the [Petitioner's] leaving the store and [the victim's] leaving to take out the trash. The footage showed Bell coming into the store, showed her leaving, and briefly showed the shooter.

During cross-examination, Bondwe testified that the [Petitioner] called him "Chicken George" because Bondwe used to cook "good chicken." Bondwe testified that he was alone in the store after [the victim] left to take the trash to the dumpster and that the [Petitioner] exited the store.

Antionette Bell testified that she was shot in her left arm on December 10, 2008, while she was at Ace Market. She described the events leading up to the shooting, saying that she walked from her home to the market, where she often shopped, to purchase beer and cigarettes. Before entering the store, she noticed a gray or silver car and saw two men, one of whom was the [Petitioner], getting out of the car. Bell asked the [Petitioner] if he "had a light." The [Petitioner] said, "[N]o, baby girl, I ain't got no light." He then felt in his pockets and said, "[Y]eah, I do got a light," and he lit her cigarette. The [Petitioner], as seen on the video footage, entered the store. Bell said she stood at the front corner of the building when the [Petitioner] exited the store and [the victim] came outside with the trash. Bell said she did not interact with the [Petitioner] at this time, and she stayed in front of the market smoking her cigarette.

Bell testified that she then heard a voice say, "[G]o get the money out of the register," to [the victim], and she heard [the victim] respond to the speaker to "go get the money" themselves. After that, Bell heard a "couple" of shots, and she ran inside the store and hid inside one of the store coolers. She said that, at some point, she felt a burn. She opened a beer and began to drink it and then lost consciousness. When she regained consciousness, she began to crawl out of the cooler.

During cross-examination, Bell testified that she could not identify the shooter. She agreed that she had been drinking that evening but denied that she was intoxicated. She said that she had smoked marijuana earlier that day but denied using crack cocaine that day. Bell said she saw [co-defendant] Brian Moreland at the market the evening of the shooting and that he gave her a dollar. Bell admitted that she had previously been convicted of two counts of attempted second degree murder.

Lieutenant Matt Pylkas, with the Metropolitan Nashville Police Department, testified that, when he received the call about this shooting, he traveled a few miles north of the market and then back to the market, hoping to find a suspicious vehicle or person of interest fleeing the market. He said that when he arrived at the 1000 block of Edgehill, he noted a vehicle that fit the description of the vehicle involved in this shooting, a silver Chevy Impala with a spoiler on the rear, some damage to one of the quarter panels, and a temporary tag. The lieutenant said he approached the unoccupied vehicle. He noted that it was a cold and rainy December night, and he noted that there was heat emanating from the engine. Lieutenant Pylkas looked inside the vehicle, and he saw what appeared to be black stocking caps. . . .

. . . .

Jerome Oseibonsu testified that he owned Kobby's Auto Sales in Nashville. In 2009, police contacted him about a car that he had sold to a man named Rivera Peoples[, also a co-defendant]. He said the bill of sale showed that he sold the car, a 2000 gray Chevrolet Impala, on November 24, 2008. [Co-defendant] Peoples provided Oseibonsu several references in the event that Peoples defaulted on the loan. The first reference was Peoples's brother, Antonio Harris. The other references were [co-defendant] Brian Moreland, the [Petitioner], and Shameka Harris.

. . . .

[Co-defendant] Moreland testified that, on December 10, 2008, he was involved in attempting to rob the Ace Market with Peoples, Harris, and the [Petitioner]. He said that Harris and Peoples were brothers and that the [Petitioner] was dating their sister. Moreland said he also dated one of Harris's and Peoples's sisters. Also, Peoples was the father of the [Petitioner's] sister's children. Moreland testified that, on the night of the attempted robbery, Peoples was driving an Impala that he had recently

-4-

purchased. A few hours before going to the market, the men began discussing how they needed money. Moreland said all of the men participated in this discussion, and they settled on robbing the Ace Market. Moreland said the plan for the robbery was that the [Petitioner] would enter the store and see who was present. Then, Moreland and Harris would enter the market with their faces covered with bandanas and rob the clerk.

Moreland said that, when they arrived at the market, they sat in the car for a period of time discussing the robbery plan. The [Petitioner] then got out of the car and went into the market to see who was there. While the [Petitioner] was in the store, Peoples moved his car to another location, an alley beside the store. The [Petitioner] was on the phone with Peoples while the [Petitioner] was inside the store. Moreland said Peoples said that they were good to start the robbery, so Moreland and Harris began putting on their bandanas to start the robbery. Moreland recalled that, as the [Petitioner] exited the store, another man came out also, carrying a trash bag and walked toward the dumpster. Harris, who had his bandana on, "hopped" out of the car and shot the man. Harris then ran to the front of the store and shot in the store, and then he came back around the car and shot the man carrying the trash bag again. Harris then got inside the car. The four men left the market and went to Harris's house.

Moreland testified that the [Petitioner] did not say anything when he returned to the car from the market. He said that there was no communication between the [Petitioner] and Harris before Harris got out of the car and shot the man taking trash to the dumpster.

During cross-examination, Moreland testified that he used his own free will when he participated in this robbery. Moreland said he did not go into the store to rob it because Harris jumped out of the car and shot the man. He conceded that he did not hear what the [Petitioner] said to Peoples during their phone conversation. He denied that he shot anyone and denied that he had said that "some lady grabbed something out of [his] hand and that's why [he] shot her." He also denied saying that "the old man got in the crossfire and [he] didn't mean to kill him." Moreland agreed that he denied his involvement in this crime when he was first questioned by police. Moreland agreed that he had previously been convicted of criminal impersonation.

State v. James L. Dowell, III, No. M2011-02096-CCA-R3-CD, 2012 WL 3939978, at *1-5 (Tenn. Crim. App. Sept. 11, 2012), perm. app. denied (Tenn. Feb. 12, 2013).

Forensic testing was performed on the evidence submitted by police involved in investigating this case. According to Belinda Shea, a civilian latent fingerprint examiner with the Metropolitan Nashville Police Department, the Petitioner's fingerprints were found on a dryer sheet box located inside Peoples's car. Dowell, 2012 WL 3939978, at *3. Shea also matched fingerprints from CDs in Peoples's car to those of co-defendants Peoples and Moreland. Id. Tennessee Bureau of Investigation ("TBI") Agent Alex Brodhad testified that the bullet recovered from the victim's body and all of the cartridge cases recovered from the crime scene were fired by the same nine-millimeter gun. Id. at *4. TBI Agent James Russell Davis, II, testified that he found gunshot residue on four gloves from the car. Id. TBI Agent Michael Turbeville testified that the Petitioner "was consistent as a contributor of DNA on several items found in Peoples's car," including two pairs of gloves and a toboggan hat. Id. Agent Turbeville also confirmed the presence of the Petitioner's DNA on two bandanas and a cigarette butt. Id.

Because it is relevant to the issues presented in this appeal, we also note that, at trial, the Petitioner sought to offer the testimony of Antonio Harris, one of the men involved in the robbery.

> The [Petitioner] posited that Harris would testify that the [Petitioner] said he did not want to participate in the robbery before Harris shot and killed [the victim]. The State told the trial court that, if Harris so testified, the State wanted to cross-examine Harris about robberies that Harris and the [Petitioner] both admitted they committed together. The trial court held a jury-out hearing to determine to what extent Harris would be subject to cross-examination by the State.

> During the jury-out hearing, Antonio Harris testified that the [Petitioner] had no involvement in this shooting. Harris took responsibility for the shooting and said that he had pled guilty to charges stemming from it. Harris explained that he asked the [Petitioner] to be a lookout during the robbery. Harris said that, "once [the Petitioner] did that[,]" the [Petitioner] "changed his mind about the acts." Harris said that Harris "jumped out of the car" continued doing "what [he] intended to do from the beginning." Harris said the [the Petitioner] had no other involvement in this crime.

> During the jury-out cross-examination, Harris testified that he and the [Petitioner] were together for a couple of hours before the shooting. He said that the two men met up with a third man, Harris's brother [co-defendant] Peoples, and then, shortly before the murder, they met up with a fourth man, [co-defendant] Moreland. Harris said he proposed that the four men rob the market, and, initially, the [Petitioner] and Peoples refused.

-6-

Harris recalled that Moreland was intoxicated and "out of it mentally," so he did not respond. Harris said that he had a gun in his hand at the time and that he threatened the [Petitioner] and "intimidat[ed]" him so that the [the Petitioner] would assist in the robbery. Harris testified that the [Petitioner] only went into the market because of Harris's threats against him. He similarly testified that the only reason Peoples participated was because of his threats. He said both men knew that he would hurt them if they did not participate in the robbery.

Harris conceded that, a few weeks before the Ace Market shooting, he, the [Petitioner], Moreland, and Peoples invaded a family home in the Green Hills area of Nashville.[2] The men covered their faces with bandanas, and Harris brandished a weapon. The men forced the people in the house, at gunpoint, to get into a car and drive to two automatic teller machines ("ATMs"). The men used the people's personal identification numbers to withdraw money from their accounts. Harris said that he had forced the [Petitioner] to participate in those kidnappings and robberies as well. Harris testified that, after this robbery, the [Petitioner] continued to associate with Harris because the [Petitioner] had no choice and because the [Petitioner] was afraid of Harris. Harris said[,] "I had more pull on the street than you can imagine."

Harris conceded that he and the [Petitioner] were members of an organization known as "Growth and Development." He further conceded that other people called the organization "Gangster Disciples." Harris testified that the colors often associated with his organization were blue, grey, and black. Harris agreed that the bandanas found in the car were colors associated with his organization. Harris acknowledged that he had "tear drop tattoos," and he explained that the tattoos meant that he had "lost a couple of [his] friends." Harris agreed that the tattoos could also mean that he had killed a "couple of people."

Harris testified that the [Petitioner] was dating one of Harris's sisters. He said he and his sister both lived in the Edgehill area but that they lived separately.

---

[2] The same four men participated in two home invasions on November 23, 2008, and were thereafter charged with five counts of aggravated robbery and five counts of especially aggravated kidnapping. For a detailed recitation of the facts of those offenses, refer to State v James L. Dowell III and Rivera L. Peoples, No. M2012-00520-CCA-R3-CD, 2013 WL 1804191, at *3-13 (Tenn. Crim. App. Apr. 30, 2013).

Harris testified that the bandanas were in the car before he decided to commit the robbery. He explained that his "dress code" required that he wear a bandana if he entered a club or similar establishment. When he decided to commit the robbery, he pulled into the market and told the [Petitioner] to go inside the store and see how many people were there. Harris said he got out of the car before the [Petitioner] returned to the car. Harris said that, as he approached the store, he saw [the victim] taking out the trash. Harris recalled that, when he returned to the car after shooting [the victim], the [Petitioner] was in the car, and the four men left immediately after the shooting.

The State questioned Harris about when, during the robbery, the [Petitioner] allegedly told Harris that the [Petitioner] no longer wanted to participate in the robbery, given Harris's testimony that the [Petitioner] did not return to the car until after Harris had left the car to shoot [the victim]. Harris said the [Petitioner] told him this when Harris "was in the car." Harris then said the [Petitioner] got back to the car before Harris exited the car and shot Thompson. He clarified that it was at this point that the [Petitioner] said he did not want to participate in the robbery.

During the jury-out redirect examination, Harris testified that he got out of the car twice on the evening of the shooting. He said he was in the alley both times and that the [Petitioner] said he no longer wanted to participate in the robbery before Harris got out of the car the second time.

Defense counsel told the trial court that the defense wanted to introduce Harris's testimony to show that the Defendant no longer wanted to participate in the robbery. The State countered that Harris's testimony would allow questioning about Harris and the [Petitioner's] participation in previous robberies together. The trial court ruled that if Harris testified that the [Petitioner] expressed his desire to no longer participate in the robbery then the State could ask Harris questions to determine whether Harris was being truthful in this testimony. Those questions, the trial court stated, included questions about their relationship and their previous joint criminal ventures. Ultimately, the [Petitioner] chose not to call Harris to testify based on the trial court's ruling.

Dowell, 2012 WL 3939978, at *5-7.

B. Direct Appeal. The Petitioner appealed the jury's verdict to this court, arguing (1) that the trial court erred when it ruled that, if the Petitioner presented the testimony of

-8-

Antonio Harris, his accomplice, the State could cross-examine Harris about past criminal activities in which both the Petitioner and Harris willingly participated; and (2) that the evidence was insufficient to sustain his conviction for felony murder. This court affirmed the trial court's judgment. See Dowell, 2012 WL 3939978, at *1, *12.

Regarding the Petitioner's first issue, this court concluded that the trial court did not err when it determined that Harris would be subject to cross-examination about whether he and the Petitioner had recently committed two home invasions together. Dowell, 2012 WL 3939978, at *9. In so holding, the panel reasoned as follows:

Although this evidence meets the criteria of character evidence, the trial court correctly determined that the evidence is relevant to the litigated issue of the [Petitioner's] motive and intent to participate in the armed robbery. The [Petitioner] sought to introduce evidence that he told Harris he no longer wanted to participate in the robbery, and the fact that he and Harris had, shortly before this offense, committed . . . home invasion[s] together wherein they robbed and kidnapped the home owners became relevant to show the [Petitioner's] motive and intent.

Id.

The Petitioner also challenged the sufficiency of the evidence supporting his felony murder conviction, submitting that "the State's only witness to offer evidence that the killing took place during the robbery attempt was Antionette Bell, whom he impeached on three different occasions with her prior inconsistent statements." Dowell, 2012 WL 3939978, at *10. Finding the evidence sufficient to support the Petitioner's conviction under a theory of criminal responsibility, this court provided the following rationale:

In the case under submission, the evidence viewed in the light most favorable to the State proved that the [Petitioner] and three other men, Harris, Peoples, and Moreland, met and decided to commit a robbery. The plan to commit the robbery included that the [Petitioner] enter the market, see who was present, and inform the others. Peoples was driving the car and Harris, who was armed with a gun, and Moreland were going to enter the store and commit the robbery. The [Petitioner] entered the market, as seen on surveillance video, [and] called Peoples, who told Moreland and Harris that they were okay to proceed with the robbery. Before Moreland could exit the car to enter the store, Harris exited the car and shot [the victim], an employee of the market. Harris also shot in the direction of the market, hitting Bell. The four men got back into the car and drove to

-9-

Harris's house. This evidence is sufficient to support that the [Petitioner] is criminally responsible for the attempted robbery that resulted in the killing, and, thereby, supports his conviction for first degree felony murder.

As to the [Petitioner's] specific argument that Bell lacked credibility based upon his impeachment of her, this [c]ourt may not resolve questions of witness credibility on appeal. That function is solely within the province of the trier of fact. [State v. ]Bland, 958 S.W.2d [651,] 659 [(Tenn. 1997)]. The jury, by its verdict, accredited Bell's testimony to the extent her testimony was necessary to his conviction. We will not disturb the jury's findings.

Dowell, 2012 WL 3939978, at *12.

Our supreme court denied the Petitioner's application for permission to appeal on February 12, 2013.

C. Post-Conviction Proceedings. Following his unsuccessful direct appeal, the Petitioner filed a timely pro se petition for post-conviction relief.[3] Counsel was appointed, and an amended petition was filed. In the amended petition, the Petitioner claimed that he received the ineffective assistance of counsel in the following instances: (1) trial counsel failed to sufficiently meet with him, to keep him informed, and to "confer with [him] to discuss the details of [his] case"; (2) trial counsel failed "to appropriately object to the admission of improper 404(b) evidence"—the prior robberies committed by Harris and the Petitioner—by "not specifically limit[ing] the State's intended use of the propensity evidence and with no knowledge as to what limiting instruction would have been given[,] there could have been no appropriate decision as to whether to call Antonio Harris"; (3) trial counsel should have called Antonio Harris as a witness regardless of the trial court's 404(b) ruling because without Harris's testimony there was "complete and total lack of evidence" supporting the defense theory of duress; (4) trial counsel failed to adequately challenge the State's case (a) by objecting to the State's characterization of the victim as "killed," (b) by failing to object the State's question, "Now after you heard what you later determined to be shots," when no witness had yet testified that they ever heard shots, and (c) by failing to ask the fingerprint analyst, who "had a significant eye problem," about her physical qualifications to identify fingerprints; and (5) trial counsel failed "to appropriately voir dire the jurors" regarding

---

[3] His petition was presented to prison officials for mailing on February 10, 2014. See Tenn. R. Crim. P. 49(d) (the "prison mailbox rule" provides that papers filed by incarcerated pro se litigants may be considered filed within the prescribed time if delivered to the appropriate prison authority for mailing within the time allowed for filing); see also Tenn. S. Ct. R. 28, § 2(G).

the media coverage of the first trial.[4]  Thereafter, a hearing was held on the matter, at which only the Petitioner and trial counsel testified.

The Petitioner stated that trial counsel met with him two or three times prior to his first trial but only once between his first and second trial, estimating that trial counsel spent a total of an "hour and a half at most" meeting with him in preparation for trial. The Petitioner believed that he and trial counsel reviewed "in detail all of the events from the first trial[,]" although the Petitioner could not recall for certain.

The Petitioner agreed that he discussed with trial counsel whether Antonio Harris would testify on the Petitioner's behalf at the second trial and that trial counsel explained "whether the State could present other evidence against [the Petitioner's] case if Mr. Harris was called."  The Petitioner further clarified his understanding regarding Harris's testimony:  "That if Mr. Harris had testified that they [were] going to bring up more charges upon me that I was—that I was charged with at the time, that if he would testify, they [were] going to use that against me."  However, the Petitioner claimed that he had no knowledge of his defense strategy for the second trial, even after he sat through the first trial in its entirety.  "Based upon the facts that came out at trial[,]" the Petitioner opined "that it would have been beneficial to call Mr. Harris despite what [prior bad act evidence] could have come out[.]"  According to the Petitioner, Harris's testimony would have supported "other evidence" of his innocence presented during trial.

The Petitioner acknowledged that he had "a copy of all the discovery" and that trial counsel reviewed these discovery materials with him.  Moreover, the Petitioner, for "the most part[,]" was "able to communicate any concerns [he] had about [his] trial with [trial counsel.]"  Regardless, the Petitioner did not feel that trial counsel was prepared for either his first or second trial.  When asked how trial counsel could have been more prepared, the Petitioner said there "could have been more communication" and that "a better defense strategy would have helped."  Somewhat contrary to his prior testimony, the Petitioner testified that he thought that the trial strategy was to mount a duress defense, which Mr. Harris's testimony was going to "corroborate[,]" but that none of that happened, leading to no "defense at all" being presented to the jury.

On cross-examination, the Petitioner acknowledged that he was arraigned on October 14, 2009, and had "multiple court appearances" thereafter in 2009, 2010, and

_____

[4]  The Petitioner has abandoned his fourth and fifth grounds for relief on appeal, and we will treat those claims as waived.  See Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived in this court."); see also State v. Dellinger, 79 S.W.3d 458, 488 (Tenn. 2002) (refusing to address issues raised in the trial court but abandoned on appeal).  Therefore, we will limit our recount of the evidence presented at the post-conviction hearing to that relevant to the Petitioner's first three issues.

2011. Although he did not talk with trial counsel at every in-court appearance, the Petitioner did speak with trial counsel the "majority of the time" after those appearances.

The Petitioner recalled the jury-out hearing where Harris testified at his second trial and the trial court's ruling on the subject. The Petitioner admitted that he and trial counsel discussed what to do following the trial court's ruling, that trial counsel advised the Petitioner that it "would [not] be the best thing to do to" call Harris to the stand, and that the Petitioner agreed with this advice. However, the Petitioner explained his rationale,

> [T]he way he explained it to me was because I was still going to be able to go along with my defense. . . . I wasn't under the impression that I wasn't going to have a defense, that we were just going to let [the State] present [their] case and me not have a defense against it. That wasn't my understanding of it.

On redirect examination, the Petitioner testified that his meetings with trial counsel after court appearances lasted only about five to ten minutes and that they typically discussed the events of the day in court, not trial strategy. The Petitioner also believed that, prior to his second trial, he and trial counsel talked about whether to call Harris as a witness. Again, somewhat in conflict with his earlier testimony, the Petitioner said that he did not know until trial that the prior bad act evidence could be used against him if Harris testified. The Petitioner further claimed that trial counsel did not inform him that, by not calling Harris, the Petitioner's defense would be "destroyed."

Upon examination by the post-conviction court, the Petitioner stated that he had heard all of the testimony presented against him at the first trial, including Bondwe's testimony placing the Petitioner inside the market and that Bondwe and the Petitioner knew each other. Moreover, his co-defendant Brian Moreland did not testify at Petitioner's first trial, but did at the second, and Moreland provided details of the Petitioner's participation in the robbery. The Petitioner acquiesced that he "knew what all the State's proof was[,]" although, according to the Petitioner, the two trials "played [out] different[ly]" with Moreland's testimony at the second, and the State "played a video in the first" that it did not introduce in the second. The Petitioner also confirmed that trial counsel did not present a duress defense at his first trial. Finally, the Petitioner averred that trial counsel did not adequately cross-examine the State's witnesses at the second trial, but he could not recall any specifics other than that trial counsel did not "listen[] to [him.]"

Upon further redirect by post-conviction counsel, the Petitioner admitted that "the State [had] a pretty strong case with [Petitioner's] co-defendant testifying against [him]"

-12-

at the second trial. The Petitioner clarified that, prior to the second trial, he discussed the duress defense with trial counsel in "a single meeting" "for less than an hour[.]" According to the Petitioner, he believed he "knew some of" what trial counsel intended to introduce in his defense at the second trial; however, he now understood that the only evidence to support a defense of duress was Harris's testimony. The Petitioner claimed that, "[h]ad [he] known that there was no other evidence that [trial counsel] could [have] present[ed] to support that defense[, it] would . . . have affected [his] desire to call Mr. Harris as a witness[.]"

Trial counsel testified regarding his recollection of the Petitioner's case. According to trial counsel, he met with the Petitioner between "thirty to fifty times" prior to the Petitioner's first trial. Trial counsel explained that most of those meetings occurred in jail because the Petitioner was a "cooperating witness at that time," so they met with the district attorney's office frequently.

According to trial counsel, the defense strategy at the Petitioner's first trial was "withdrawal." In addition, he sat down with the Petitioner after the first trial and went "over all the things [they] learned in the first trial." Although they may not have known exactly what evidence the State intended to present at the Petitioner's second trial, they "knew all the evidence that was out there," including the possibility of a co-defendant Moreland's[5] testifying against the Petitioner at his second trial. Trial counsel stated that the "general theory" for the second trial was "a withdrawal duress defense." Trial counsel opined that "[i]f [the State] had called all the witnesses, if [the State] had used all the confessions, if [the State] had presented all the evidence as they did in the first trial, it would have been extremely difficult on either of those defenses, withdrawing or duress."

Trial counsel then provided his rationale for not calling Harris to testify. Trial counsel stated that he knew the State would attempt to "use the other robberies against" the Petitioner if they called Harris to testify. He also recalled addressing this issue during a jury-out hearing, where he argued that the propensity evidence was not admissible. When asked why he did not raise the issue prior to trial, trial counsel explained,

> From what I remember it was just right before trial that [Harris] agreed to do that, that he agreed to actually testify. I don't—I don't think—this

---

[5] Trial counsel talked in terms of the possibility of more than one co-defendant's testifying at the Petitioner's second trial. However, Peoples proceeded to a jury trial of his own and his case was on appeal at the time of the Petitioner's trial; Harris was a proposed defense witness. The only co-defendant that was cooperating with the State was Moreland. Moreland provided similar testimony against Peoples at Peoples's August 2010 trial. See Peoples, 2012 WL 2356584, at *3-4. Moreland also testified against both Peoples and the Petitioner in the home invasion cases. See Dowell and Peoples, 2013 WL 1804191, at *10-11.

-13-

wasn't something that was available to us until the beginning. If it had been, of course we would have done it sooner. I believe this is one where it was just last minute. I don't know what made him decide to—I think maybe it was because he had lost an appeal. I can't remember. But there was a reason that he agreed to do this and his attorney was okay with it.

Trial counsel stated that, in light of the trial court's ruling admitting the prior bad act evidence and trial counsel's observation of Harris's demeanor on the witness stand, he did not believe Harris's testimony "would . . . go well at all with the jury." According to trial counsel, he discussed this decision with the Petitioner.

Trial counsel acknowledged that Harris's testimony was a "crucial part" of the defense theory, but he also believed the Petitioner was going to testify on his own behalf. However, the Petitioner decided he did not want to testify following the jury-out hearing concerning Harris's testimony and Moreland's trial testimony, according to trial counsel. When asked if he had "an alternative theory of defense outside of withdrawal or duress[,]" trial counsel replied, "Well, the State, of course, has to prove the case." Trial counsel clarified that duress or withdrawal was the "main sort of way to go" "[b]ecause everything else [was] confirmed. You've got the video, you've got the confessions, I actually think there were two confessions, only one of them was used though. And then you've got his handwritten statements. You had all of these pieces of evidence." He continued that, "if all of that came in, the only gap you had in time to really create this doubt was that phone call." Trial counsel opined, "The second case I felt was a really strong case" for the State.

Furthermore, at the Petitioner's second trial, the State did not play the Petitioner's video-recorded interview, so they "could not get in the Chicken George defense." Trial counsel explained this defense as follows:

And basically the first trial Mr. Chicken George—everybody knows about this. He would fry chicken at the store, and he knew—he knew [the Petitioner]. And he would sell cigarettes to him underage. So I felt like that was a good defense when that came out because that was rather unexpected. . . . And the—what was said on that phone call was crucial, like was it a call where he was calling the other people to come in and rob the store or was it a call where he says, hey, I know Chicken George, I've known him for five years and he's working in the store and he's the only one here.

Additionally, trial counsel stated that, due to the strong case against the Petitioner, he encouraged the Petitioner to take the State's offer of twenty years as a Range I,

-14-

standard offender.  He believed that this offer was made soon after the first trial ended in a hung jury, and he remembered discussing the State's offer with the Petitioner.  Trial counsel acknowledged that this plea offer did not dispose of the prior robbery cases that were still pending.

On cross-examination, trial counsel stated that he met with the Petitioner approximately thirty times between the first and second trials.  He explained,

> I didn't have as many meetings as I did the first time, but there were still issues that came up, the letter, the other issues that were coming up that had to do with the case.  I met with him more frequently than I think would have been necessary just because of these other extraneous matters that were going on.

According to trial counsel, he "spent hours upon hours" on the Petitioner's case.  Trial counsel asserted that he was prepared for trial, which included his filing pre-trial motions and conferring with his investigator.  Additionally, trial counsel confirmed that he talked with the Petitioner about defense strategy during their meetings.  Trial counsel averred that he discussed the decision not to call Harris to the stand with the Petitioner during trial and that the Petitioner agreed with trial counsel's advice.

Trial counsel testified that the Petitioner wanted "the original deal" he was offered by the State, but "it was hard for [the Petitioner] to realize that writing that letter and sending it to the other attorney and to [the assistant district attorney] sort of destroyed [the Petitioner's] possibility of being the cooperating witness."  Regarding the plea offer, trial counsel filed a "motion to try to enforce it" and get the Petitioner "the benefit of the bargain[,]" to no avail.

On redirect examination, trial counsel was asked, "When you discussed with [the Petitioner] calling Mr. Harris . . . did you explain that there wouldn't be other evidence that you would be presenting that would actually present duress or withdrawal to the jury?"  Trial counsel answered affirmatively but clarified that he advised the Petitioner to testify "to get his theory across"; however, the Petitioner, as was his right, chose not to take the stand in his own defense.

The Petitioner returned to the witness stand and testified that "[t]here was absolutely no offer of twenty years between trials, before trial, or after trial."  The Petitioner was asked if he was "ever aware of any offer formally made by the district attorney's office[.]"  He responded, "Absolutely not.  Because after the first deal—the deal that didn't go through, the D.A. didn't offer me anything after that."  The Petitioner also clarified that "[t]here was some proceeding with [him] and the district attorney that

-15-

preceded all trials but didn't go through"; this prior proceeding was not what he was talking about, however. The Petitioner averred that, had an offer of twenty years been communicated to him, he would have accepted it due to the strong evidence against him.

Upon examination by the post-conviction court, the Petitioner stated that "[t]here was never a letter to the district attorney" but that the letter "in question was a letter that [he] wrote under duress to a co-defendant." He agreed that the letter "totally undercut any testimony" he might have given as a cooperating witness. Furthermore, the Petitioner disagreed with trial counsel that he advised him to testify. According to the Petitioner, "[he] wasn't worried about getting up here and testifying to the fact that [he] was under duress" when he wrote the letter but that trial counsel recommended that he not testify, so he did not.

In closing, post-conviction counsel argued that the Petitioner's trial counsel should have called Harris as witness despite the prior bad act evidence because it was the only evidence establishing the defense theories of duress or withdrawal. Post-conviction counsel also noted that trial counsel could have requested a limiting instruction on the use of such evidence. Moreover, post-conviction counsel submitted that the Petitioner did not understand that, by not calling Harris or testifying on his own behalf, no defense at all was put forth to the jury.

The post-conviction court thereafter denied the Petitioner relief in an extensive written order filed on June 2, 2016, concluding that the Petitioner had failed to establish his claims of ineffective assistance of counsel. This timely appeal followed.

ANALYSIS

Post-conviction relief is available when a "conviction or sentence is void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." Tenn. Code Ann. § 40-30-103. Criminal defendants are constitutionally guaranteed the right to effective assistance of counsel. Dellinger v. State, 279 S.W.3d 282, 293 (Tenn. 2009) (citing U.S. Const. amend. VI; Cuyler v. Sullivan, 446 U.S. 335, 344 (1980)). When a claim of ineffective assistance of counsel is made under the Sixth Amendment to the United States Constitution, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. Strickland v. Washington, 466 U.S. 668, 687 (1984); see Lockhart v. Fretwell, 506 U.S. 364, 368-72 (1993). "Because a petitioner must establish both prongs of the test, a failure to prove either deficiency or prejudice provides a sufficient basis to deny relief on the ineffective assistance claim." Goad v. State, 938 S.W.2d 363, 370 (Tenn. 1996). The Strickland standard has been

applied to the right to counsel under article I, section 9 of the Tennessee Constitution. State v. Melson, 772 S.W.2d 417, 419 n.2 (Tenn. 1989).

Deficient performance requires a showing that "counsel's representation fell below an objective standard of reasonableness," despite the fact that reviewing courts "must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." Strickland, 466 U.S. at 688-89. When a court reviews a lawyer's performance, it "must make every effort to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's conduct, and to evaluate the conduct from the perspective of counsel at that time." Howell v. State, 185 S.W.3d 319, 326 (Tenn. 2006) (citing Strickland, 466 U.S. at 689). Additionally, a reviewing court "must be highly deferential and 'must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.'" State v. Honeycutt, 54 S.W.3d 762, 767 (Tenn. 2001) (quoting Strickland, 466 U.S. at 689). We will not deem counsel to have been ineffective merely because a different strategy or procedure might have produced a more favorable result. Rhoden v. State, 816 S.W.2d 56, 60 (Tenn. Crim. App. 1991). We recognize, however, that "deference to tactical choices only applies if the choices are informed ones based upon adequate preparation." Cooper v. State, 847 S.W.2d 521, 528 (Tenn. Crim. App. 1992) (citing Hellard v. State, 629 S.W.2d 4, 9 (Tenn. 1982)).

As to the prejudice prong, the petitioner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Vaughn v. State, 202 S.W.3d 106, 116 (Tenn. 2006) (citing Strickland, 466 U.S. at 694). "A reasonable probability is a probability sufficient to undermine confidence in the outcome." Strickland, 466 U.S. at 694. "That is, the petitioner must establish that his counsel's deficient performance was of such a degree that it deprived him of a fair trial and called into question the reliability of the outcome." Pylant v. State, 263 S.W.3d 854, 869 (Tenn. 2008) (citing State v. Burns, 6 S.W.3d 453, 463 (Tenn. 1999)). "A reasonable probability of being found guilty of a lesser charge . . . satisfies the second prong of Strickland." Id.

The burden in a post-conviction proceeding is on the petitioner to prove his allegations of fact supporting his grounds for relief by clear and convincing evidence. Tenn. Code Ann. § 40-30-110(f); see Dellinger, 279 S.W.3d at 293-94. On appeal, we are bound by the post-conviction court's findings of fact unless we conclude that the evidence in the record preponderates against those findings. Fields v. State, 40 S.W.3d 450, 456 (Tenn. 2001). Additionally, "questions concerning the credibility of witnesses, the weight and value to be given their testimony, and the factual issues raised by the evidence are to be resolved" by the post-conviction court. Id. Because they relate to mixed questions of law and fact, we review the post-conviction court's conclusions as to

-17-

whether counsel's performance was deficient and whether that deficiency was prejudicial under a de novo standard with no presumption of correctness. Id. at 457.

First, we must address an issue not raised by the State in response to the Petitioner's allegations, which is the Petitioner's severely wanting appellate brief.[6] The only issue specified for our review is "whether trial counsel failed to adequately communicate with the Petitioner." Then, after providing the legal tenants of ineffective assistance of counsel claims, the Petitioner's entire argument on appeal is as follows:

> Trial counsel . . . was ineffective as trial counsel did not properly inform [the] Petitioner of the details of his case and did not effectively communicate with the client. Trial counsel failed to call a potential defense witness to establish a duress defense and failed to inform [the Petitioner] that without that witness there was effectively no defense. Further, trial counsel failed to inform [the Petitioner] of an offer to settle the case. But for trial counsel's ineffective assistance, the jury would not have convicted [the Petitioner].

In total, the argument section of the Petitioner's brief is seven sentences long; his brief, in total, is only three pages.

---

[6] The State does argue that two of the Petitioner's allegations on appeal—(1) that trial counsel failed to inform the Petitioner that without Harris's testimony, there would be no duress defense; and (2) that trial counsel failed to inform the Petitioner of an alleged plea offer—were not raised his petition for post-conviction relief, and therefore, this court should treat those allegations as waived. Evidence at a post-conviction hearing is "limited to issues raised in the petition." Tenn. Sup.Ct. R. 28, § 8(D)(4) (stating that "[t]he hearing shall be limited to issues raised in the petition"); see Tenn. Code Ann. § 40-30-110(c) (stating that "[p]roof upon the petitioner's claim or claims for relief shall be limited to evidence of the allegations of fact in the petition"); Tenn. Code Ann. § 40-30-104(d) (stating that "[t]he petitioner shall include [in his petition] all claims known to the petitioner for granting post-conviction relief"). Regarding the Petitioner's claim that trial counsel failed to inform him that without Harris, there was effectively no defense, it was arguably raised in the post-conviction petition, albeit in general terms. Moreover, the Petitioner's assertion about trial counsel's failure to convey a plea offer arguably did not arise until trial counsel's testimony at the post-conviction hearing. In any event, the State did not object to the Petitioner's presenting evidence about this alleged failure to inform the Petitioner about his defense absent Harris's testimony and about a plea offer that was never conveyed to him, and testimony was presented at the post-conviction hearing in these regards. Accordingly, we will consider the issues on their merits because the evidence was heard, and ruled upon, by the post-conviction court. See Walsh v. State, 166 S.W.3d 641, 645 (Tenn. 2005) (concluding that the State's failure to assert the defense of waiver at the post-conviction hearing precluded it from asserting the same on appeal); see also Tenn. Code Ann. § 40-30-110(f) ("There is a rebuttable presumption that a ground for relief not raised before a court of competent jurisdiction in which the ground could have been presented is waived.").

The Petitioner does not provide this court with any idea in his appellate brief of what details trial counsel failed to convey or how said lack of communication worked to the Petitioner's prejudice. Moreover, the Petitioner does not identify the "potential defense witness" by name that trial counsel failed to call in support of the Petitioner's duress defense. Also, the Petitioner does not specify the particulars of the offer that trial counsel failed to convey or argue that he would have accepted the offer instead of proceeding to trial.

Rule 10 of the Rules of the Court of Criminal Appeals of Tennessee addresses inadequate briefs. It states, in relevant part, "Issues which are not supported by argument, citation to authorities, or appropriate references to the record shall be treated as waived in this court." Tenn. Ct. Crim. App. R. 10(b); See also Tenn. R. App. P. 27(a). Accordingly, he arguably waived appellate review of these issues. See, e.g., Martin Dean Gibbs v. State, No. M2016-00218-CCA-R3-PC, 2016 WL 5944992, at *3 (Tenn. Crim. App. Oct. 13, 2016) (declining to review the petitioner's ineffective assistance of counsel claims due to an inadequate brief), perm. app. denied (Tenn. Feb. 16, 2107). Waiver notwithstanding, we find no merit to the Petitioner's claims, which we briefly choose to address.

A. Failure to effectively communicate with the Petitioner or discuss defense strategy and details of his case. At the evidentiary hearing, the Petitioner testified that trial counsel met with him two or three times prior to the first trial and one time between the first and second trial, spending a total of an hour and half at most meeting with him. However, the Petitioner confirmed that trial counsel also met with him during numerous courtroom appearances for at least five to ten minutes each time. The Petitioner further agreed that trial counsel reviewed discovery with him, that they discussed defense strategies, that he was able to express his concerns to trial counsel "for the most part," and that he had the benefit of hearing the State's proof against him at the first trial, which he went over with trial counsel prior to his second trial.

Trial counsel, on the other hand, testified that he met with the Petitioner at least thirty to fifty times prior to the Petitioner's first trial and approximately thirty times between the first and second trials. Trial counsel asserted his belief that he was prepared for trial. According to trial counsel, he and the Petitioner discussed trial strategy, and that strategy changed somewhat between the first and second trial because one of the Petitioner's co-defendants, Brian Moreland, would possibly testify as a witness against the Petitioner. Moreover, the State did not introduce the Petitioner's video-recorded statement in the second trial, which helped bolster the Petitioner's withdrawal defense in the first trial, according to trial counsel, by creating the "Chicken George" scenario.

The post-conviction court rejected the Petitioner's allegation that trial counsel failed to adequately meet with him, communicate with him, or keep him informed of the details of his case. First, the post-conviction court reasoned that, considering the Petitioner's testimony alone, the Petitioner had failed to establish "that trial counsel was ineffective in his communication with [the] Petitioner or that [the] Petitioner was prejudiced by this alleged deficiency." Next, the post-conviction court accredited the testimony of trial counsel that he adequately communicated with the Petitioner, which is a determination we do not disturb on appeal. See Fields, 40 S.W.3d at 456. We agree that the Petitioner has failed to meet his factual burden of proof.

B. Failure to call Antonio Harris or inform the Petitioner that without Harris's testimony, there was effectively no duress defense. Importantly, we note that, from our review of the trial record, trial counsel never intended on pursuing a defense of duress. As this court noted in the direct appeal opinion, "[Trial] counsel told the trial court that the defense wanted to introduce Harris's testimony to show that the [Petitioner] no longer wanted to participate in the robbery[,]" i.e., a withdrawal defense. See Dowell, 2012 WL 3939978, at *7. In fact, trial counsel made several statements specifically denying any intent to argue duress to the jury using Harris's testimony, going so far as to agree to exclude portions of Harris's testimony.

Regardless, trial counsel averred that Harris's decision to testify for the Petitioner was made "just right before" the second trial was to begin, so he did not have time to address the prior bad act evidence in limine. The trial court's decision to allow the character evidence if Harris testified was affirmed by this court on direct appeal. See Dowell, 2012 WL 3939978, at *7-9. We note that Harris's testimony not only allowed introduction of evidence of the prior robberies but also evidence that the Petitioner was associated with Harris through membership in a criminal gang. This gang evidence would have been highly prejudicial to the Petitioner's case. Also, Moreland testified that he was a willing participant in the robbery of Ace Market, indicating that he was not forced by Harris to take part.

In addition, the Petitioner testified that he and trial counsel discussed the possibility of a duress or withdrawal defense at the second trial and calling Harris to support said defense. Trial counsel stated that, after the trial court's ruling on the prior bad act evidence and observing Harris's demeanor, however, he did not think it was a good plan to call Harris to the witness stand. Trial counsel said that he advised the Petitioner of such, including explaining "that there wouldn't be other evidence that [we] would be presenting that would actually present duress or withdrawal to the jury[.]" Trial counsel clarified that he advised the Petitioner to testify "to get his theory across"; however, the Petitioner chose not to take the stand in his own defense. Moreover, the

-20-

Petitioner conceded that he agreed with trial counsel's decision not to present Harris as a witness.

The post-conviction court previously accredited the testimony of trial counsel. It also appears that trial counsel proceeded with a withdrawal defense, to the best of his ability, despite the strong case against the Petitioner. We agree with the post-conviction court that the Petitioner has failed to establish either deficient performance or prejudice in this regard.[7]

C. Failure to convey a plea offer. The Petitioner asserted that his trial counsel rendered ineffective assistance when he failed to communicate a favorable plea offer to him. The post-conviction court, apparently reviewing the direct appeal technical record, made the following findings in its order:

> It appears that the State conveyed only one offer to [the] Petitioner, which was prior to the first trial. This offer was revoked after [the] Petitioner wrote his letter to the State prior to the trial of Rivera Peoples where [the] Petitioner denied his previous statements. Since [the] Petitioner's cooperation no longer assisted the State, [the assistant district attorney] moved forward with an agreement with Brian Moreland. After [the] Petitioner's first trial, on June 9, 2011, [t]rial [c]ounsel filed a motion to try to enforce the State's initial offer. This [c]ourt held a hearing on the issue on June 21, 2011, and denied the motion in a written order filed June 27, 2011.

We note that neither the motion to enforce the plea agreement nor the hearing on the motion is included in the appellate record, and it is the Petitioner's duty to prepare an adequate record for review. See Tenn. R. App. P. 24(b). The only testimony given at the post-conviction hearing about the details of the offer was from trial counsel that the plea offer was twenty years, as a Range I, standard offender, on the murder charge and that it was made after the Petitioner's first trial resulted in a hung jury. Regardless of the timing of the offer, either before or after the Petitioner's first trial, trial counsel testified that he had discussions with the Petitioner about the State's initial offer and that he encouraged the Petitioner to accept it. The Petitioner's own testimony confirmed that he was aware

---

[7] The post-conviction court also cited Black v. State, 794 S.W.2d 752, 757 (Tenn. Crim. App. 1990), which holds that, when an ineffective assistance of counsel claim is predicated upon trial counsel's failure to present witnesses or introduce evidence, such witness's testimony and evidence should be offered at the evidentiary hearing in order for the trial court to determine whether the failure to call a witness or introduce evidence prejudiced the petitioner. In this case, we know what Harris's trial testimony would have been, having the trial transcript of the jury-out hearing where Harris testified under oath. Accordingly, we decline to apply the holding of Black to this case.

of the plea deal offered by the State: "Because after the first deal—the deal that didn't go through, the D.A. didn't offer me anything after that." This account was not inconsistent with trial counsel's version. There does not appear to have been any plea offer that trial counsel failed to communicate to the Petitioner.

Trial counsel also testified that the Petitioner wanted "the original deal" he was offered by the State, but "it was hard for [the Petitioner] to realize that writing that letter and sending it to the other attorney and to [the assistant district attorney] sort of destroyed [the Petitioner's] possibility of being the cooperating witness." After the Petitioner's first trial, trial counsel filed a motion to enforce the plea agreement, and a hearing was held, albeit with a negative result for the Petitioner. Again, the post-conviction court credited the testimony of trial counsel over that of the Petitioner, noting that trial counsel testified that he had discussions with the Petitioner about the plea offer.[8] The Petitioner, once more, has failed to meet his factual burden of proof and is not entitled to relief.

## CONCLUSION

Based upon the foregoing, the judgment of the post-conviction court is affirmed.

_____
D. KELLY THOMAS, JR., JUDGE

---

[8] The post-conviction court did not address this issue in a separate section of its order but did so in the failure to communicate section.